Marcus A. NOBLE, Plaintiff,

v.

BRINKER INTERNATIONAL, INC., Defendant.

No. C2–00–663.

United States District Court, S.D. Ohio, Eastern Division.

Dec. 12, 2001.

Dennis M. McGuire, Columbus, OH, for plaintiff.

Thomas Louis Rosenberg, Ulmer & Berne, Columbus, OH, for defendant.

### ORDER AND OPINION

MARBLEY, District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment filed on July 27, 2001. For the following reasons, the Court **DENIES** Defendant's Motion for Summary Judgment in part and **GRANTS** the Motion in part.

## I. INTRODUCTION

This is a race discrimination case brought by Plaintiff Marcus Noble ("Noble") against Defendant Brinker International, Inc. ("Brinker"). Brinker is a holding company whose subsidiaries operate a number of concept restaurants, including Romano's Macaroni Grill and Chili's, which are located throughout the country.[1] Mr. Noble, an African–American and former employee of Macaroni Grill, claims that he was subjected to disparate treatment in terms and conditions of employment with Brinker in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000 *et seq.* (1991), and the Ohio Revised Code §§ 4112 .02 and 4112.99. Noble also alleges that he was terminated in violation of Ohio public policy for filing a lawsuit against another former employer.

## II. FACTS

Noble began working as a server at the Macaroni Grill in Worthington, Ohio, on July 9, 1998. At that time, Linda Lawrence ("Lawrence") worked as the restaurant's General Manager. Noble was work-

---

**1.** As Brinker operates Romano's Macaroni Grill, the terms Brinker and Macaroni Grill are used interchangeably.

ing at Chili's, another Brinker-operated restaurant, when he applied for a position at Macaroni Grill. Although the employment application asked applicants whether they worked at other Brinker concepts, Noble left this space blank. When he first began his employment with Macaroni Grill, Noble attended an orientation session and received intensive training relating to such items as steps of service and menu knowledge. Noble was also required to pass a written and oral examination before commencing work as a server. While Plaintiff passed the written exam, he had difficulty passing the oral test. Lawrence administered the oral test eight or nine times without satisfaction that Noble was ready to wait tables. Finally, Associate Manager Jeannie Osborne ("Osborne") tested Noble and determined that he was prepared to begin work. Plaintiff claims that Lawrence gave him a much more difficult oral exam than she used with white employees. With Noble, she allegedly asked questions from the entire menu in addition to those from a preprinted oral exam sheet.

Shortly after Noble began working, Lawrence discovered that he was also working at Chili's. This concerned Lawrence because Noble's application did not indicate his second employment, and the company could be forced to pay overtime if Noble worked more than 40 hours per week between the two restaurants. Plaintiff claims that Lawrence became infuriated when she learned of his second job and accused him of defrauding Brinker. Noble states that several other white employees were similarly employed, which was not prohibited under company policy unless overtime pay became an issue. Lawrence, Osborne, and Noble discussed the issue, and Plaintiff accused Lawrence of confronting him because of his race.

At that time, Noble also confronted her about various other actions she had taken that he had perceived as racist. Plaintiff, for instance, believed that white coworkers were given better shifts than African–American employees; that African–American servers were denied priority customer opportunities; that African–American workers were kept later than white workers at the end of shifts; and that African–Americans were forced to endure an intimidating, hostile, and offensive work environment. When Noble raised these issues, he states that Lawrence became polite and did not fire him as he feared she would. Soon thereafter, Plaintiff contacted Defendant to complain about Lawrence's behavior.

Lawrence claims that she received three guest complaints relating to Noble on November 25, 1998. First, a guest called and complained that Noble deliberately rushed the table to finish their meals. Second, that same evening, a server summoned Lawrence to a table where the guests complained that they heard Noble using profanity. Both the server and the guests identified Noble as the individual who had used profanity. Third, Lawrence learned that Noble had failed to greet a table within forty-five seconds of the guests being seated, as required by company policy. In this case, the guests waited approximately ten minutes. Noble admitted that this incident occurred and, when confronted by the manager about it, stated that the guests "can wait."

Plaintiff claims that the charge that he rushed guests was simply a reasserted allegation that Lawrence had made two months earlier, after which Osborne defended Noble's conduct. But by November 25, 1998, Osborne had quit and Plaintiff asserts that Lawrence simply fabricated the latter complaint to justify suspending Noble. Plaintiff denies that he ever used profanity near a table. And Plaintiff maintains that, although he did not formally greet them because he

was busy tending to a cork he had broken in a wine bottle, he acknowledged the guests who were left waiting, as required by management when servers are extremely busy. He further claims that many white servers were late to their tables but were never disciplined.

Lawrence and Noble discussed these complaints on November 25, 1998, and Lawrence claims that at this meeting Noble did not deny that the first two events had occurred. Plaintiff, however, contends that at the meeting he denied that he had rushed the guests or had used profanity. In accordance with standard practice to issue written warnings for guest complaints, Lawrence issued three written Notices of Violation to Noble, each of which he signed. Plaintiff states that he originally refused to sign the notice pertaining to making the guests wait, but Lawrence allegedly told him that failure to sign would result in his immediate termination. Plaintiff now maintains that, even if these events did occur, they happened on different nights and not the evening of November 25, 1998, as Lawrence claims. After issuing the three Notices of Violation, Lawrence suspended Noble for two weeks without pay. Plaintiff states that he again contacted Defendant about Lawrence's alleged disparate treatment, but Defendant failed to respond. Plaintiff alleges that Lawrence fabricated the first two complaints so that she could suspend him. He argues that Lawrence knew that another violation would result in termination, and that his suspension would set the stage for his discharge.

In January 1999, Lawrence transferred out of the Worthington Macaroni Grill to a Macaroni Grill in Maine, and Tony Ficorilli ("Ficorilli") transferred in and replaced her as General Manager. On Thursday, April 15, or Friday, April 16, 1999, Ficorilli noticed that he had an evening shift that needed to be covered by a server that Saturday, April 17, 1999. Ficorilli claims that he asked Noble if he would be willing to cover the shift, and Noble agreed to do so. Ficorilli states that he confirmed the arrangement with Noble at least twice during their conversation. Yet, Noble did not show up for work that Saturday and did not call to explain his absence. Ficorilli states that he decided to terminate Noble's employment for not showing up or calling on Saturday, April 17, 1999.

Noble admits that he understood that a failure to call or show for an assigned shift could result in termination. Plaintiff had been sick that week and had obtained a doctor's note attesting to his tonsilitis and excusing him from work between April 14 and April 19, 1999. But since he was feeling better by Friday, April 16, 1999, Noble went to work because he told Ficorilli that he would be there that day. He then provided the doctor's note to a manager. Plaintiff states that during his Friday night shift, he never agreed to cover a shift on Saturday, April 17, 1999. He also felt better on Sunday and went to work, where he learned from Service Manager John Clark ("Clark") that he was being terminated for a "no-call/no-show" the previous evening.

Plaintiff contends that, generally, agreements between servers to pick up or switch shifts were recorded in the shift pick-up book and signed by the servers and a manager; oral agreements were usually not allowed. If such an agreement involved a manager and a server, it did not have to be recorded in the shift pick-up book, but was generally recorded in the manager's log. When Noble picked up shifts for other managers, they required it to be in writing. The agreement between Ficorilli and Noble, however, was not recorded in writing anywhere. Ficorilli did not put Noble's name on Saturday's work schedule, but maintains that he listed No-

ble in the "Cruise Control" computer program used by Defendant to create schedules and update rosters. While Ficorilli states that an employee can get his or her job back with a legitimate excuse, Plaintiff was not rehired after he presented the doctor's excuse.

Consequently, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on January 11, 2000, and received a Right to Sue letter on March 22, 2000. Plaintiff's Complaint was filed on June 15, 2000, and contains four counts: Count I alleges racial discrimination under Title VII of the Civil Rights Act of 1964, as amended (1991), 42 U.S.C. §§ 2000 *et seq.;* Count II alleges racial discrimination under the Civil Rights Act of 1866, 42 U.S.C. § 1981; Count III alleges racial discrimination under the Ohio Revised Code §§ 4112.02 and 4112.09; and Count IV alleges retaliation and wrongful termination in violation of public policy.

### III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.,* 8 F.3d 335, 340 (6th Cir.1993) (citation omitted). "[S]ummary Judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (finding summary judgment appropriate when the evidence could not lead a trier of fact to find for the nonmoving party).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see also Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Searcy v. City of Dayton,* 38 F.3d 282, 286 (6th Cir.1994). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the nonmoving party. *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505; *see also Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995).

### IV. ANALYSIS

#### A. Threshold Considerations Regarding Plaintiff's Discrimination Claims

Defendant argues that Plaintiff's Title VII Claims are time-barred and that Noble failed to exhaust his administrative remedies. A plaintiff asserting Title VII Claims must file a charge with the EEOC

within 180 days of the alleged unlawful practice or within 300 days where the plaintiff first files with a state or local employment agency. *See* 42 U.S.C. § 2000e–5(e). Since Ohio is a deferral state, only those allegedly discriminatory actions that occurred within the 300 days prior to the filing of the charge are actionable. *Perazzo v. Top Value Enterprises, Inc.*, 590 F.Supp. 428, 432 (S.D.Ohio 1984).

Noble filed his charge with the EEOC on January 11, 2000. As March 17, 1999 is 300 days prior, only those actions occurring on or after March 17, 1999 should be actionable. Based on Noble's testimony, the only action that occurred after that date was his termination. Defendant claims that Plaintiff has apparently not alleged in his Complaint that his termination was based upon race discrimination. And all other actions, such as the delay in passing the oral examination, Lawrence's alleged instruction to the hostesses not to seat guests in Noble's station, and the two week suspension, occurred prior to January 1999. Therefore, Brinker contends that all of Noble's Title VII claims are time-barred.

Furthermore, Defendant maintains that Noble failed to exhaust his administrative remedies by not cooperating with the EEOC's investigation. Title VII plaintiffs who resort to the administrative process yet fail to cooperate in proceedings can fail to exhaust their administrative remedies. *Barnes v. Levitt*, 118 F.3d 404, 409 (5th Cir.1997), *cert. denied*, 523 U.S. 1136, 118 S.Ct. 1839, 140 L.Ed.2d 1090 (1998); *Hill v. Runyon*, 959 F.Supp. 488, 495 (N.D.Ill. 1997) (holding that plaintiff failed to exhaust administrative remedies when he became impatient, demanded that the EEOC cease its investigation, and rushed to the courthouse). In *Barnes*, the plaintiff failed to exhaust her administrative remedies where she, through her counsel, declined to cooperate with the SEC's investigation

into her EEOC Complaint and informed the investigator that the SEC would receive information through the discovery process after she filed her complaint in court. *See Barnes*, 118 F.3d at 407. Brinker claims that after Noble filed a discrimination charge with the EEOC, the Commission's investigator originally advised Noble that everything was approved. But shortly thereafter, the EEOC decided it needed more information before issuing a right to sue letter. Noble then wrote to the EEOC investigator, stating:

> This letter is a follow up letter to the letter dated February 7, that told me to disregard your letter dated February 2. In a letter dated February 11, I made it clear to the E.E.O.C. that I didn't like, that based on the Respondents request you had the nerves to try to help the respondent out by tring (sic) to find something in a second interview to dismiss the charges . . . so I want my right to sue letter so that I can file my case in Federal Court immediately or before Friday March the 10. . . .

Brinker claims that this April 17, 2000 letter responded belligerently to the investigator's attempts to investigate the matter, and that it demanded a right to sue letter. Although Plaintiff received a right to sue letter, such an issuance does not necessarily mean that a complainant has exhausted his administrative remedies. *Adair v. Broadlawns Medical Center*, 102 F.Supp.2d 1092, 1095 n.2 (S.D.Iowa 1999); *Dates v. Phelps Dodge Magnet Wire Co.* 604 F.Supp. 22, 27 (N.D.Ind.1984). Defendant argues that Plaintiff failed to exhaust his administrative remedies, since Noble's actions allegedly undermined the purposes of administrative exhaustion to investigate and conciliate matters and prevent overburdening courts.

As an initial matter, Defendant errs in claiming Plaintiff did not allege

race discrimination in his Complaint. Noble's Complaint clearly does so in Count I, ¶¶ 34–37. While Defendant correctly points out that his claims are subject to the 300 day window, Plaintiff has produced enough evidence to fall within the exception for a continuing violation. The continuing violation doctrine provides that when "there is an ongoing, continuous series of discrimination acts, they may be challenged in their entirety as long as one of those discriminatory acts falls within the violations period." *Haithcock v. Frank*, 958 F.2d 671, 677 (6th Cir.1992). When a continuing violation is shown, "a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." *Alexander v. Local 496, Laborers' Intern. Union of North America*, 177 F.3d 394, 408 (6th Cir.1999).

 Continuing violations may be shown in one of two ways. The first is "where there is some evidence of *present* discriminatory activity giving rise to a claim of a continuing violation" and "at least one of the forbidden discriminatory acts occurred within the relevant limitations period." *Haithcock*, 958 F.2d at 678 (citation omitted). Plaintiff was terminated on April 18, 1999, and alleges that communications between Lawrence and Ficorilli after the latter became Manager helped lay the groundwork for Noble's firing. Lawrence spoke of "challenges" she encountered at Macaroni Grill, and Plaintiff argues that personnel issues were included in her discussions with Ficorilli. Lawrence's treatment of Noble, by perhaps disciplining him unfairly, may well have laid the foundation for his termination under Ficorilli's supervision. Since Ficorilli fired him after March 17, 1999, and the termination may have been tied to prior discrimination, all discriminatory acts that occurred prior to March 17, 1999, are actionable under the continuing violation doctrine.

Plaintiff can also demonstrate a "longstanding and demonstrable policy of discrimination" to satisfy the continuing violation doctrine. *Id.* To make such a showing, Noble must establish "that some form of intentional discrimination against the class of which plaintiff was a member was the company's 'standing operating procedure.'" *EEOC v. Penton Indus. Publ'g Co.*, 851 F.2d 835, 838 (6th Cir. 1988) (citation omitted). Noble alleges that Macaroni Grill discriminated against African–Americans in hiring, promotion, compensation, and treatment. Another African–American server named Wally, for instance, was hired at the same time as Plaintiff but quit after Lawrence failed him on the oral examination numerous times. Plaintiff claims that Lawrence instructed the hostesses to send guests away from his coverage areas; that Lawrence generally did not hire African–Americans, and those she did hire were either fired or quit; and that Lawrence systematically denied them leadership positions and berated them when they made mistakes, although she did not disparage white servers who made mistakes.

Noble has raised sufficient issues of material fact to suggest that Brinker's alleged discriminatory practices may have been part of a larger pattern and practice of disparate treatment dating back to when he was first hired. Plaintiff's allegations certainly suggest that Brinker may have had a longstanding and over-arching policy of discrimination. *Haithcock*, 958 F.2d at 678. Such disparate treatment could very well have been the "standing operating procedure" of Lawrence. *Penton Indus. Publ'g Co.*, 851 F.2d at 838. Since Plaintiff has offered evidence that all of these actions may be part of a continuing violation, Noble's claims are not time-barred.

■ Plaintiff also has not failed to exhaust his administrative remedies. Defendant's argument here is unpersuasive and does not rely on any Sixth Circuit precedent. The Fifth Circuit's *Barnes* ruling is also distinguishable, as that plaintiff "repeatedly refused to answer questions, provide details, make a statement, give a deposition or even sign her complaint." *Barnes*, 118 F.3d at 409. The Fifth Circuit determined that the plaintiff "wholly failed to exhaust her administrative remedies" because of her repeated attempts to thwart the process. *Id.; see also Hill*, 959 F.Supp. at 495 (plaintiff's counsel "repeatedly failed to provide the EEOC with the information it required and requested to conduct an investigation"). In this case, however, Noble cannot be said to have so undermined the EEOC's investigation process, as he essentially cooperated with them while seeking a right to sue letter. Noble's April 17, 2000 letter that Defendant cites simply does not rise to the same level of uncooperative behavior seen in *Barnes* and *Hill*. Therefore, the Court finds that Plaintiff's discrimination claims are not time-barred and that he did not fail to exhaust his administrative remedies before filing suit.

## B. Plaintiff's Title VII Discrimination Claims

■ Defendant argues that Plaintiff has failed to state a *prima facie* claim of race discrimination under Title VII, which provides in pertinent part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

42 U.S.C. § 2000e–2(a)(1). Ohio Revised Code § 4112 is the state law equivalent of Title VII. The Ohio courts have held that the evidentiary standards and burdens of proof applicable to a claimed violation of Title VII of the Civil Rights Act of 1964 are likewise applicable in determining whether a violation of Ohio Rev.Code § 4112 has occurred. Thus, the federal case law governing Title VII actions is generally applicable to cases involving alleged violations of § 4112. *Williams v. Ford Motor Co.* 187 F.3d 533, 538 (6th Cir.1999) (citations omitted).

### 1. *Prima Facie* Case of Discrimination

It is well settled that, without direct evidence of discrimination, a Title VII plaintiff must first establish, by a preponderance of the evidence, a *prima facie* case of racial discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a *prima facie* case, the plaintiff must show: (1) that he was a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that he was replaced by a person outside the class. *Id.* The plaintiff can also make out a *prima facie* case by showing, in addition to the first three elements, that "a comparable non-protected person was treated better." *Id.*

■ With respect to the second element of the *prima facie* case, the adverse employment action must be "materially adverse" in order for the plaintiff to succeed on a Title VII claim. *See Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir.1999) (citing *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir.1996) to apply the "materially adverse" requirement of the ADA to a Title VII claim). Adverse employment actions include: "termination of employment, a demotion evidenced by a decrease in wage or salary, a

less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Kocsis,* 97 F.3d at 886 (citation omitted). They do not include: "mere inconvenience" or "an alteration of job responsibilities." *Hollins,* 188 F.3d at 662. Although not reaching the question directly, the Sixth Circuit has noted in *dicta* that "[a] fifteen-day suspension probably does not qualify as an adverse employment action either." *Birone v. Indian River Sch.,* No. 97–3212, 1998 WL 199791, at *4 (6th Cir. Apr.15, 1998).

■ As for the third element of a *prima facie* case, in ascertaining whether the plaintiff was qualified for the position, the court must look to the plaintiff's qualifications before his allegedly unacceptable performance began. *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 661 (6th Cir.2000) (finding that "it is [ ] inappropriate for the district court in the pre-trial stage to rely on the nondiscriminatory reason for termination to find plaintiff's prima facie case inadequate").

■ Under the fourth element, early jurisprudence suggested that the exemplar comparable employee must be "similarly-situated *in all respects.*" *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992) (citing *Stotts v. Memphis Fire Dep't,* 858 F.2d 289 (6th Cir.1988)). In *Pierce v. Commonwealth Life Insurance Co.,* 40 F.3d 796 (6th Cir.1994), the Sixth Circuit elaborated on this standard:

> In order for two or more employees to be considered similarly-situated for the purpose of creating an inference of disparate treatment in a Title VII case, the plaintiff must prove that all of the relevant aspects of his employment situation are nearly identical to those of the ... employees who[m] he alleges were treated more favorably. The similarity between the compared employees must

exist in all relevant aspects of their respective employment circumstances.

*Id.* at 802 (quoting *Ruth v. Children's Med. Ctr.,* No. 90–4069, 1991 WL 151158, at *6 (6th Cir. Aug.8, 1991)). The Sixth Circuit advanced the evolution of the similarly-situated criterion in *Perry v. McGinnis,* 209 F.3d 597 (6th Cir.2000), when it shifted its focus from formalism to functionality by ruling that "in applying the ·[similarly-situated] standard courts should not demand exact correlation, but should instead seek relevant similarity." *Id.* at 601 (citing *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998)). Thus, for another employee to be "comparable" to a plaintiff, he must be similarly-situated in all *relevant* respects.

■ In the matter *sub judice,* Defendant maintains that none of Plaintiff's allegations establishes a *prima facie* case under Title VII. With regard to the oral examination, Defendant argues that it is undisputed that a server must pass the oral examination before being certified to serve tables at Macaroni Grill. The temporary delay Plaintiff suffered from not passing the test immediately does not, according to Defendant, constitute an adverse employment action. Not every action that makes an employee unhappy or resentful is an adverse employment action. *Primes v. Reno,* 190 F.3d 765, 767 (6th Cir.1999). Noble was informed that he failed the test because he needed more time to learn the menu and the pronunciation of the names of the dishes. Defendant also claims that Plaintiff is unable to establish that Lawrence passed any similarly-situated white employees who had similar difficulty with the tested topics. According to former Associate Manager Timothy Wiseman, a number of white servers failed the oral examination upon their first attempt.

Brinker also argues that Noble cannot establish a *prima facie* case that he earned less in tips on days that he opened with Lawrence as Manager because she instructed the hostesses not to seat guests in his section. Defendant contends that Plaintiff cannot prove that Lawrence so instructed hostesses each time she opened the restaurant with Noble, and can only rely on inadmissible hearsay for this proposition. Brinker acknowledges that Lawrence stated in her deposition that she· sometimes slowed or stopped the seating of guests into Noble's station during the course of his shift due to his inability to service properly his current tables. But managers have instructed hosts or hostesses to slow the seating of guests to the stations of many servers, including white workers, who were falling behind in servicing their current guests. Defendant maintains that Plaintiff has not identified any similarly-situated white servers who were treated more favorably under the circumstances.

Defendant further argues that Noble cannot establish a *prima facie* case that his two week suspension starting November 25, 1998, was discriminatory, because he cannot show that similarly-situated white coworkers were not suspended under similar circumstances. Brinker asserts that Noble has no evidence for his claim that white servers were late to their tables but not disciplined, and lacks proof that guests complained about those servers. To establish a *prima facie* case on this charge, Defendant believes that Noble must prove that a similarly-situated white server received three written warnings about guest complaints in such a short amount of time yet was not suspended.

The Court finds that Plaintiff has established a *prima facie* case of race discrimination. As an African–American, Noble, of course, satisfies the first prong of the *Mitchell* test. Under the second prong, his termination surely constitutes an adverse employment action. *Kocsis,* 97 F.3d at 876. Defendant is correct in arguing that Plaintiff's delay in passing the oral examination and his two week suspension are not adverse employment actions.[2] Nonetheless, Plaintiff challenges a pattern of alleged discrimination, not simply his delay in starting or his suspension. The Court may consider Noble's delay in passing the oral examination and his two week suspension as evidence of a pattern and practice of discrimination by Defendant.

Indeed, Noble has presented evidence that he failed the oral test not because he had difficulty with its content, but because Lawrence administered a much more difficult test to him than his white coworkers. Lawrence, for example, may have asked white employees questions from a pre-printed form, though she tested African–Americans by asking additional questions straight from the menu. Noble also offers evidence that his two-week suspension on November 25, 1998 was based on Lawrence's discriminatory acts. Plaintiff argues that Lawrence fabricated the complaints against him that led to his three written warnings and suspension, while she did not process such complaints against white workers. Defendant argues that Plaintiff is unable to cite similarly-situated white servers who received three warnings but were not suspended, but that is exactly Plaintiff's point: Brinker maintained two systems of discipline-one for

---

**2.** *See Bowman v. Shawnee State Univ.,* 220 F.3d 456, 462 (6th Cir.2000) ("the very temporary nature of the employment action in this case [ten day removal of plaintiff's responsibilities as coordinator] makes it a non-materially adverse employment action."); *Bi-rone v. Indian River Sch.,* No. 97–3212, 1998 WL 199791, at *4 (6th Cir. Apr.15, 1998) (noting in *dicta* that "[a] fifteen-day suspension probably does not qualify as an adverse employment action").

white workers and another for African–Americans.

In his deposition, for instance, Plaintiff listed several white employees who were late to greet tables because they were smoking, but were not disciplined by Lawrence. Plaintiff contends that since the work environment was small and Plaintiff knew all of his coworkers, he would have heard about disciplinary action against white servers had Lawrence taken any. In fact, Noble argues that it would be remarkable if a white employee was disciplined and Plaintiff did not know about the disciplinary action taken. In each instance, white employees escaped discipline, though he did not. The Court finds that this pattern of disparate treatment will obviously result in African–Americans accumulating more warning letters and other discipline than their white colleagues for the same conduct. A vicious cycle, then, is created-the white workers will never receive three warning letters leading to suspension because they are always excused, while African–Americans are not. Still, even if Plaintiff's arguments as to his oral examination and suspension fail, based on his termination alone, Noble has met the second element of the *prima facie* test.

Plaintiff satisfies the third prong, as he was qualified for the position of server before his allegedly unacceptable conduct began. He had long worked in the restaurant industry, including at another Brinker-operated establishment; he easily passed the written test to begin as a server at Macaroni Gill; and Noble eventually passed the oral test—on his first try when administered by Osborne and based on the same preprinted form used to question white workers.

Plaintiff also meets the fourth standard as elaborated in *Perry v. McGinnis*. He has raised several issues of material fact relating to similarly-situated white coworkers who received no disciplinary action when greeting tables late, who were given easier oral exams, and who were given priority in customer seating. Plaintiff contends that he was not given as many customers as his white colleagues when he opened the restaurant with Lawrence. On many occasions, Plaintiff would be forced to stand around because he did not have any guests seated at his station, or significantly fewer guests than white servers. He claims that it was a joke among the servers that Lawrence would not seat guests in his station. White servers would even give Plaintiff tables to wait on to help him earn tips when Lawrence worked. The Court may consider all of this in the context of Plaintiff's claim that Defendant engaged in a pattern and practice of discrimination by treating similarly-situated white coworkers more favorably than him.

And, most importantly for the purposes of examining the fourth element of Plaintiff's *prima facie* case, the Court finds that Noble has met his burden under *Mitchell* by citing a similarly-situated white employee who was not terminated for being a no-call/no-show, while Plaintiff was fired. Specifically, Plaintiff cites Mike Brahler, a white server, who was a repeated no-call/no-show but was not fired by Defendant. In his deposition, Ficorilli claims that he did terminate Brahler for this behavior. Yet, Assistant Manager Wiseman stated that Ficorilli did not fire Brahler; Wiseman testified in his deposition that Brahler quit. Thus, at the very least, Plaintiff has raised a genuine issue of material fact.

### 2. Pretext

Once the plaintiff establishes a *prima facie* case under Title VII, the defendant must come forward with a legitimate non-discriminatory reason for the adverse employment action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Warfield v. Lebanon Correctional Inst.*, 181

F.3d 723, 729 (6th Cir.1999). The defendant need not show that the decision was motivated by the proffered reason, only that the non-discriminatory reason is legally sufficient to justify a judgment for the defendant. *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (noting that, when proceeding under the *McDonnell Douglas* framework, the defendant's burden to bring forth a legitimate, nondiscriminatory reason for its action "is one of production, not persuasion"). If the defendant proffers a sufficient nondiscriminatory reason, then the presumption created by the *prima facie* case is rebutted. *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097; *Burdine*, 450 U.S. at 255, 101 S.Ct. 1089. The plaintiff then must demonstrate that the employer's offered reason is but a pretext for unlawful discrimination. *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097; *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

In *Reeves*, the Supreme Court held that "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097; *see also Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 343 (6th Cir.1997) (noting that, "[u]nder this method, if the plaintiff establishes that the defendant's reasons are pretextual the trier of fact is permitted, but not required, to enter judgment for the plaintiff").

█ An employee can show pretext in three different ways. First, the employee may offer evidence that the employer's asserted reason has no basis in fact. *Gray v. Toshiba America Consumer Products, Inc.*, 263 F.3d 595, 600 (6th Cir.2001); *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). Second, the employee may argue that the reason was insufficient to discipline the employee. *Manzer*, 29 F.3d at 1084. Third, the employee may offer evidence that the reason did not actually motivate the employer's decision. In the first two methods, the court may infer discrimination. *Id.*

In the third method, when the plaintiff argues that the defendant's reasons did not actually motivate the adverse employment action, the plaintiff must come forward with additional evidence of discrimination. If the plaintiff does not come forward with additional evidence, "[t]he plaintiff has failed to prove pretext and judgment for the defendant is warranted . . . ." *Kline*, 128 F.3d at 346–47. The third type of case arises "[w]hen the plaintiff has failed to introduce evidence that the reasons offered by the defendant are 'factually false.'" *Manzer*, 29 F.3d at 1084.

█ Assuming that Plaintiff has established a *prima facie* case of discrimination, Defendant claims that Plaintiff cannot prove that Brinker's legitimate nondiscriminatory reasons for these actions were pretextual. First, Brinker asserts that Lawrence did not pass Noble on the oral exam because he needed more time to learn the menu and the pronunciation of the names of the dishes. Despite Noble's contention that he passed the oral test earlier, a plaintiff's assessment of his own qualifications or performance is insufficient as a matter of law to create a genuine issue of material fact with respect to pretext. Furthermore, Defendant argues that Lawrence had good reason to occasionally slow seating in Noble's section to ensure that the current guests would be properly attended. Finally, Brinker claims to have had a legitimate nondiscriminatory reason for suspending Noble for two weeks: he received three written warnings based on guest complaints. His use of profanity, his

failure to greet guests within forty-five seconds of their arrival, and his rushing guests all contributed to Lawrence's decision to suspend Noble for two weeks on November 25, 1998. And Noble's contention that Lawrence was a racist fails to establish pretext. A plaintiff's subjective belief of discrimination is insufficient as a matter of law to defeat summary judgment. *Mitchell,* 964 F.2d 577, 585–86 (6th Cir.1992) ("rumors, conclusory allegations and subjective beliefs ... are wholly insufficient evidence to establish a claim of discrimination as a matter of law").

While Defendant has proffered several legitimate nondiscriminatory reasons for these actions, Plaintiff has met the *Reeves* test for demonstrating pretext. First, Noble has shown that Lawrence may well have had no basis in fact for repeatedly failing Noble on the oral examination. He had easily passed the written test and passed the first normal oral exam administered by someone other than Lawrence—Osborne. Noble's delay in becoming a server could have been pretext for discrimination. Similarly, he has alleged that there was no basis in fact for two of the written warnings leading to his suspension, in that he denies rushing guests or ever using profanity around guests. In arguing that he often stood around without guests while white coworkers were busy, Noble has shown pretext as to Lawrence's justification for slowing and stopping seating of guests in his section. During his tenure, Plaintiff also overheard Lawrence make numerous racial slurs, including: "You people can't think without making mistakes."

Finally, Defendant has offered no evidence that Plaintiff's supposed agreement to cover the Saturday, April 17, 1999 shift was recorded as normal. Plaintiff, in fact, has provided evidence that the agreement to work that night never appeared in the .computer generated schedule that was posted on the restaurant's bulletin board. Noble maintains that he never made such an agreement and provided a doctor's note explaining any such absence that weekend. Nonetheless, Defendant refused to rehire him. Plaintiff has shown that his termination was pretextual, as it either had no basis in fact if there was no agreement, or because Ficorilli's stated reason did not actually motivate him because he otherwise would have given Plaintiff his job back once presented with the doctor's note.

As Plaintiff has established a *prima facie* case of discrimination and demonstrated pretext, the Court **DENIES** Defendant's Motion for Summary Judgment on these issues.

## C. Plaintiff's 42 U.S.C. § 1981 Claim

Section 1981 provides:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(a)-(b). The elements of a *prima facie* case under § 1981 are the same for those in a Title VII action. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Jackson v. Quanex Corp.,* 191 F.3d 647 (6th Cir.1999). Section 1981, however, differs from Title VII in several respects.

First, the plaintiff must demonstrate purposeful discrimination in a § 1981 claim. *General Bldg. Contractor's Assoc., Inc. v. Pennsylvania,* 458 U.S. 375, 390, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). The burden of demonstrating purposeful discrimination is present throughout the *prima facie* case and, if applicable, in the pretextual analysis. Second, the doctrine of *respondeat superior* does not apply in § 1981 actions. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Third, in contrast to Title VII, defendants can be held individually liable for discrimination under § 1981. *Jones v. Continental Corp.,* 789 F.2d 1225, 1231 (6th Cir.1986). To establish individual liability, the individual defendant must have been personally involved in the discriminatory action. *Allen v. Ohio Dept. of Rehabilitation and Correction,* 128 F.Supp.2d 483, 495 (S.D.Ohio 2001).

Defendant argues that Plaintiff's § 1981 claim fails because purposeful discrimination cannot be proved, and because the doctrine of *respondeat superior* does not apply to actions under § 1981. Defendant contends that Plaintiff has never argued that Brinker engaged in purposeful discrimination against him on the basis of race, but rather that Lawrence discriminated against him in her individual capacity as General Manager.

■■■■ The Court finds that Plaintiff is able to sue Defendant under § 1981 for these alleged discriminatory acts. Plaintiff alleges that Lawrence, Ficorilli, and other supervising managers have engaged in purposeful discrimination against Plaintiff and other African–American employees of Macaroni Grill. While the doctrine of *respondeat superior* does not apply in this case, Defendant can still be held liable based on common law agency theories. *See, e.g., Alexander v. Local 496, Laborers' Intern. Union of North America,* 177 F.3d 394 (6th Cir.1999) (common law agency theories of vicarious liability govern the liability of international labor organizations for the acts of their local unions that violate Title VII and § 1981). A principal may be held liable for the intentional torts of its agent if the agent's conduct is within the scope of his or her agency and if, with the knowledge of the conditions, the principal intends the conduct or its consequences. *Id.*

■■■ Brinker may be liable for failing to prevent harassment by its employees. Defendant's liability is based on common law agency principles, and an affirmative duty to act to prevent or to stop the harassment. While not strictly liable, Defendant has a duty to act reasonably under the circumstances. Plaintiff argues that Defendant knew that managers at the Worthington, Ohio Macaroni Grill were creating an intimidating and hostile work environment for African–Americans, but failed to take corrective action. Plaintiff notes that Defendant transferred Lawrence to Maine not because she was discriminating, but because she was not meeting financial goals.

Defendant is also liable for the discriminatory acts of Lawrence and Ficorilli because they supervised Noble and had such powers of hiring, firing, and discipline. *See Fitzgerald v. Mountain States Tel. and Tel. Co.,* 68 F.3d 1257, 1263 (10th Cir.1995) ("[a]n employer is liable under both Title VII and section 1981 where the action complained of was that of a supervisor, authorized to hire, fire, discipline or promote, or at least to participate in or recommend such actions, even though what the supervisor is said to have done violates company policy."). In the case *sub judice,* Noble has provided evidence that his supervising managers, Lawrence and Ficorilli, who Brinker authorized to hire, fire, and discipline employees, intentionally discriminated against Plaintiff.

As Plaintiff's § 1981 claims are not barred as a matter of law, the Court **DENIES** Defendant's Motion for Summary Judgment on this issue.

### D. Plaintiff's Claim of Wrongful Discharge in Violation of Public Policy

Plaintiff's last claim is that Defendant wrongfully discharged him in violation of public policy because he was terminated in retaliation for seeking legal advice and filing a lawsuit against a former employer. Brinker contends that Noble's wrongful discharge claim fails as a matter of law. Noble testified in his deposition that his retaliation claim is not based on his seeking legal advice, but rather on a lawsuit he filed against his former employer, Buckeye Hall of Fame Café. Plaintiff contends that this claim is based on both his seeking legal advice and filing a lawsuit against his former employer, as was first stated in his Complaint. Noble points out that a clear public policy exists in Ohio discouraging retaliation by employers against their employees who consult attorneys. *See Simonelli v. Anderson Concrete Co.,* 99 Ohio App.3d 254, 650 N.E.2d 488 (1994).

■ In order to state a claim of wrongful discharge in violation of public policy, "a plaintiff must allege facts demonstrating that the employer's act of discharging him contravened a 'clear public policy.'" *Painter v. Graley,* 70 Ohio St.3d 377, 383, 639 N.E.2d 51 (1994). The "clear public policy" can be based on statutes, the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law. *Id.* at 384, 639 N.E.2d 51; *see also Collins v. Rizkana,* 73 Ohio St.3d 65, 70, 652 N.E.2d 653 (1995) (holding that a cause of action may be brought for wrongful termination in violation of public policy based on sexual harassment and discrimination). In *Kulch v. Structural Fibers, Inc.,* 78 Ohio St.3d 134, 677 N.E.2d 308 (1997), the Ohio Supreme Court set out the elements necessary to succeed on a claim for wrongful discharge in violation of public policy under Ohio law:

(1) that [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and (4) the employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Id.*

■ The Court finds that Plaintiff has not raised an issue of material fact allowing him to satisfy the *Kulch* test. Noble correctly asserts that the first two factors of the *Kulch* test are questions of law for the Court to decide, although the third and fourth elements are for the trier of fact, and are not appropriate for summary judgment. Yet as Plaintiff fails to satisfy the test's "clarity" and "jeopardy" elements, the Court need not examine the test's third and fourth prongs.

■ Noble bases this particular cause of action on an alleged violation of Article I Section 16 of the Ohio Constitution, the "Open Courts" provision, which provides in pertinent part: "All courts shall be open, and every person, for an injury done him in his land, goods, person or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay." While Ohio's Open Courts provision discourages retaliation by employers against employees who consult attorneys, Plaintiff cannot cite any public policy that discourages retaliation against employees who file lawsuits against third-

parties. Indeed, discharging an employee for filing a lawsuit against a third-party that affects the business interests of the employer does not violate the Open Courts provision. *See Takach v. American Medical Technology, Inc.,* 128 Ohio App.3d 457, 715 N.E.2d 577 (1998), *discretionary appeal dismissed,* 85 Ohio St.3d 1213, 709 N.E.2d 169 (1999). Noble stated in his deposition that he was not aware of Brinker terminating him in retaliation for seeking legal advice as opposed to filing a lawsuit. Plaintiff thus conceded that he can offer no facts to support this claim. Noble's reliance upon the mere allegation in his Complaint relating to this claim fails to defeat summary judgment. Thus, Plaintiff fails to satisfy the first prong of the *Kulch* test. As Plaintiff cites no public policy, none is jeopardized by his termination, and Noble cannot satisfy the second element of the *Kulch* test.

The Court, therefore, **GRANTS** Defendant's Motion for Summary Judgement on this claim.

## V. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion for Summary Judgment as to Plaintiff's claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000 *et seq.* (1991), the Ohio Revised Code §§ 4112.02 and 4112.99, and 42 U.S.C. § 1981. The Court **GRANTS** Defendant's Motion as to Plaintiff's claim of wrongful discharge in violation of Ohio public policy.

**IT IS SO ORDERED.**