**Richard HAITHCOCK, Plaintiff–Appellant,**

v.

**Anthony M. FRANK, Postmaster General, Defendant–Appellee.**

No. 91–3649.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 18, 1992.

Decided March 5, 1992.

Lee Hornberger (Argued and Briefed), Cincinnati, Ohio, for plaintiff-appellant.

Joan C. Goodrich (Argued and Briefed), U.S. Postal Service, Office of Labor Law, Washington, D.C. and Gregory G. Lockhart, Office of the U.S. Atty., Dayton, Ohio, for defendant-appellee.

Before MARTIN and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Plaintiff-appellant, Richard Haithcock, appeals the dismissal of his claims of racial and handicap discrimination brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* for failure to exhaust his administrative remedies. For the reasons that follow, we reverse the decision of the lower court.

## I.

Plaintiff-appellant, Richard Haithcock, is a black male who suffers from a collapsed vertebrae and seizure impairments. He was hired by the Postal Service as a custodian at its Lancaster, Pennsylvania facility on May 3, 1985. In response to his physical limitations, the Postal Service issued restrictions which precluded appellant from operating moving vehicles or machinery, and lifting more than fifty pounds continuously or seventy pounds occasionally.

In July 1986, a custodial position at the Xenia, Ohio Postal Facility became vacant. Appellant requested a transfer to the Xenia facility. In August 1986, Mr. Wilson Watkins, the postmaster at Xenia, approved Mr. Haithcock's transfer request. Appellant became the second custodian at Xenia; however, shortly after his arrival the other custodian, Mr. Dave Perry, transferred to the agency's Dayton facility. Because there was a hiring freeze in effect, Watkins did not hire a second custodian. Therefore, appellant was the only full-time custodian at the Xenia facility.

On July 16, 1987, appellant's medical restrictions were changed by Dr. Colglazier, the postal physician. Colglazier recommended the following restrictions: (1) no hazardous duty; (2) no operating revolving machinery or vehicles; (3) no working above floor level; (4) no lifting over 25 pounds; (5) no constant, repeated or frequent bending, twisting or stooping. Accordingly, Watkins, in order to accommodate appellant's restrictions, assigned clerks and part time carriers to help appellant perform his custodial duties. In addition, Watkins instructed appellant not to perform any work that would be outside of his physical restrictions and met with supervisory personnel and informed them of Haithcock's physical impairments.

Appellant, however, alleged that Watkins made him do work not permitted by his restrictions, including "changing light bulbs, climbing ladders, heavy lifting, working around revolving machinery, and cancelling mail." On September 20, 1987 appellant claimed that he injured his back lifting a bag of "quick dry." Appellant filed a grievance in October, 1987, claiming that the agency was forcing him to perform tasks which were beyond his medical restrictions. The grievance was settled in appellant's favor, and an informal EEO complaint, also lodged by appellant, was likewise settled in his favor.

In February, 1988 appellant was disciplined for an altercation that occurred between himself and supervisor Richard Chambliss. Appellant received a three-week suspension, and was ordered to undergo a psychiatric evaluation to determine his fitness for duty. The psychiatrist found that appellant was fit for duty. Appellant filed a grievance contesting his three-week suspension. Watkins settled the grievance in appellant's favor, awarding him back pay and rescinding the disciplinary action.

On August 13, 1988, while appellant was absent for medical reasons, Mr. James Huber, a mail carrier, transferred to the vacant custodial position at Xenia. Mr. Huber was not medically prohibited from performing any of the custodial duties.

On June 19, 1988, Mr. Ron Keiber replaced Mr. Watkins as the postmaster at Xenia. Appellant was on either leave without pay status or annual leave from June 7, 1988 through July 10, 1988. Appellant informed Keiber that his absences were due to seizure problems and that he did not really "feel like coming back to work yet." On July 2, 1988 appellant advised the post office that he had a doctor's appointment on July 5, 1988 and that he would return to work following that appointment.

Appellant never returned to work. On July 18, 1988 he tendered his resignation, effective August 1, 1988. Appellant listed medical conditions and limitations as the reason for his resignation. Appellant alleged that he verbally informed Mr. Keiber that his resignation was additionally motivated by his being subject to continuous harassment.

Appellant's resignation was finalized on August 1, 1988. However, because he had a workers' compensation claim pending at that time, Postal Service rules and regula-

tions required that another job offer be made to appellant within his physical limitations. Accordingly, Mr. Melvin Stencel, Management Sectional Director of Human Resources, directed Mr. Timothy Fagan, Supervisor of Mails, to draft a job offer for appellant. Fagan drafted the job offer which was approved by Stencel, and sent to appellant by certified mail.

On August 19, 1988 appellant accepted the Postal Service's offer of employment dated August 4, 1988. On August 20, 1988 appellant reported for work at the Xenia facility. However, Mr. Ron Moeller, who was now the Postmaster at Xenia, would not allow appellant to return to work at that time because he did not have "written authorization from Human Resources stating that he was to return to work on a certain date," nor did appellant have a completed medical "fitness for duty" form. Thereafter, Mr. Moeller contacted Mr. Fagan and requested a job description for appellant so that he would know exactly what duties appellant could perform within his limitations.

On August 31, 1988 appellant successfully completed his fitness for duty examination and reported for work on September 1, 1988. When he reported for work, appellant was given a tour of the Xenia facility. Following the tour, Mr. Fagan gave Mr. Huber, the custodian, the tour notes and instructed Huber to draft a job description for appellant. Huber apparently told Thomas Porter, a distribution clerk at the Xenia facility, that he was writing a job description which appellant would not accept. Appellant also alleged that Fagan told Distribution Clerk David Smith "they were really trying to give [appellant] the shaft as far as the job goes." Fagan said that they "did not want" appellant and were trying to put him out of the Postal Service.

Fagan reviewed and approved the job description which Huber had drafted and agreed that it complied with appellant's physical restrictions. Fagan then drafted a second job offer, which differed from the August 4, 1988 job offer in that it had a new seniority date, a probationary period, and offered only split days off. Fagan met with appellant, tendered the second job offer on September 9, 1988, and said "either you want the job or you don't" and "this is the way it's going to be." Appellant rejected the agency's second job offer.

Thereafter, on September 29, 1988, appellant contacted Mr. Arper Tentman, EEO Counselor. Tentman allegedly told appellant that he could no longer file charges since he was no longer employed by the Postal Service. Appellant then went to Union President John Smith and told him about his conversation with Tentman. Smith called Tentman on the telephone, and told him that appellant wanted to file EEO charges and arranged a meeting between the two on October 4, 1988.

Appellant met with Tentman, as scheduled, on October 4, 1988. Tentman, at that time, agreed that appellant was within the EEOC's thirty-day contact requirement. At this meeting, Tentman reportedly told appellant that his replacement was a white male. In addition, they discussed appellant's first job offer, and appellant's claim that he accepted it but that the Postal Service would not allow him to return to work. They also discussed the terms of the second job offer.

Further EEO counseling occurred in December 1988 with counselor Barbara Martin. At this time, appellant apparently alleged to Ms. Martin that he was discriminated against because he was not permitted "to take the job offer of Custodian, Level 3, at Xenia, Ohio Post Office that he accepted on August 19, 1988." Appellant completed EEO counseling on January 1, 1989.

On February 6, 1989 appellant filed a formal EEO complaint alleging that he had been discriminated against because of race and handicap. In the complaint, appellant alleged the following discriminatory acts: (1) the August 4, 1988 job offer; (2) acceptance of the job offer, and his attempted return to work on August 20, 1988; (3) the Postal Service's refusal to allow him to work on August 20, 1988; (4) appellant's replacement by a non-minority, James Hu-

ber; and (5) the September 7, 1988 [1] job offer which "placed Complainant at a disadvantage." Joint Appendix at 85–86.

On March 14, 1989 appellant received the Postal Service's final agency decision on his formal complaint. The decision found that appellant was untimely in contacting the EEO counselor. The date of first contact was held to be December 1, 1988, Joint Appendix at 64–65, and the alleged discriminatory act occurred on August 20, 1988. Therefore, the EEO contact was not made within the thirty-day limitations period of 29 C.F.R. 1613.214(a)(1)(i).

Mr. Haithcock appealed the Postal Service's decision to the EEOC. In his EEOC complaint, he alleged the following:

(1) Mr. Haithcock reported for work on August 20, 1988. Acting Postmaster Kieber refused to let Complainant work, stating, "you will never work at this office as long as I'm Postmaster here." He thereupon sent Mr. Haithcock for a physical exam. (2) On August 31, 1988 Mr. Haithcock took the required physical exam. (3) On September 7, 1988 Mr. Haithcock was given another job offer, inferior to the first with a lower pay level, with loss of seniority and with split days off. Mr. Haithcock rejected this offer because of his position that he had already accepted the first offer.

Joint Appendix at 50. The EEOC, on June 14, 1989, also rejected appellant's appeal as untimely.

Appellant then filed an action in the district court, alleging that the Postal Service discriminated against him in violation of Title VII and the Rehabilitation Act. Appellant attempted to avoid the preclusive effects of the thirty-day time limit by arguing that there was a "continuing violation" by appellees. Since the last incident of discrimination took place on September 9, 1988, the complaint was timely filed.

By consent of the parties the case was referred to a United States Magistrate before whom all proceedings were held and who entered judgment in the case.

The Postmaster General, on February 28, 1990, moved to dismiss the action, or, in the alternative, for summary judgment on the basis that appellant had failed to exhaust his administrative remedies. The magistrate denied the appellee's motion for summary judgment, reasoning that: "[T]his court cannot say at this stage of the litigation that Plaintiff cannot produce sufficient evidence to withstand a motion for directed verdict on the issue that he did not comply with the thirty (30) day time requirement of 29 C.F.R. § 1613.214." Joint Appendix at 159. In support of its "continuing violation" theory, appellant also cites the Final Pretrial Order, wherein appellee averred "that plaintiff's complaint in its entirety referenced only the circumstances surrounding the August 4, 1988 job offer, Haithcock's attempts to return to work, the [alleged] withholding of the August 4, 1988 certified letter, and the September 7, 1988 job offer." Joint Appendix at 220.

Trial was held for five days on September 24, 25, and 26, 1990 and on October 8, and 9, 1990. On June 12, 1991 the magistrate held in favor of appellee, finding that appellant was time-barred from maintaining his case. The magistrate reasoned that appellant had suffered the alleged discrimination on August 20, 1988, yet he first contacted an EEO Counselor on September 29, 1988, well beyond the thirty-day limitations period. The magistrate disallowed appellant's continuing violation theory, holding:

Haithcock's own informal and formal complaints refer to the date of the alleged discriminatory act as occurring on August 20, 1988. That was the date Haithcock reported for work after accepting the job offer dated August 4, 1988, was verbally tormented by Moeller, and prevented from working. In spite of the appalling way in which the various supervisors in the Service treated Haithcock, the allegations in his administrative complaints make it clear that he failed to contact an EEO counselor within thirty

1. Discovery subsequently revealed that the actual date of the second job offer was September 9, 1988 and not September 7, 1988. Thus, all future references to the second job offer should be read as occurring on September 9, 1988.

(30) days of the alleged discriminatory act.

It was not until he submitted his brief in support of his appeal of the Final Agency Decision that Haithcock raised the issue of a continuing violation, thereby, at least theoretically, making his September 29, 1988, contact with Tentman timely as to some of the offensive incidents which occurred. Unfortunately, however, this Court is required to look with disfavor upon such an attempt to bypass the administrative remedies provided for by Title VII and the Act. Joint Appendix at 342. The magistrate also rejected equitable tolling as a means for appellant to preserve his claims.

Judgment was entered in favor of appellee on June 13, 1991. Appellant filed a motion for review in the district court. The motion was struck in light of the parties' consent to trial before the magistrate. Appellant filed the instant notice of appeal on July 11, 1991.

II.

Appellant first argues that the magistrate erred in holding that, since he did not allege the existence of a continuing violation until his appeal to the EEOC, he was precluded from raising that theory later because he did not exhaust his administrative remedies. The magistrate held that appellant's administrative complaint to the Postal Service did not allege a continuing violation. The magistrate reasoned that the complaint alleged that the discriminatory acts occurred only on August 20, 1988. Since appellant did not raise a continuing violation at the first stage, the Postal Service was not given the opportunity to address it, and therefore appellant was precluded from raising it on appeal. For the following reasons, we disagree with the magistrate's analysis and conclusion.

A person who claims to have been discriminated against in violation of Title VII may not seek relief in federal court unless administrative remedies have first been exhausted. *Brown v. General Services Administration*, 425 U.S. 820, 832, 96 S.Ct. 1961, 1967–68, 48 L.Ed.2d 402 (1976). Likewise, a handicapped person alleging discriminatory treatment must exhaust administrative remedies as a condition to seeking redress in federal court under the Rehabilitation Act of 1973. *Smith v. United States Postal Service*, 742 F.2d 257, 262 (6th Cir.1984).

In *Parsons v. Yellow Freight Systems, Inc.*, 741 F.2d 871 (6th Cir.1984) this circuit held that:

> The requirement that the plaintiff exhaust administrative remedies prior to instituting suit is intended to ensure that the Commission will have been afforded an opportunity to attempt conciliation and voluntary settlement, "the preferred means for resolving employment discrimination disputes."

*Id.* at 873; *accord Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017–18, 39 L.Ed.2d 147 (1974). The courts have thus held that if a plaintiff did not first present a claim to the Equal Employment Opportunities Commission, that claim may not be brought before the federal courts on appeal. *Lowe v. City of Monrovia*, 775 F.2d 998, 1003 (9th Cir.1985), *amended*, 784 F.2d 1407 (9th Cir.1986); *Jackson v. Ohio Bell Telephone Co.*, 555 F.Supp. 80 (S.D.Ohio 1982).

In determining whether a plaintiff has properly raised his charges at the administrative level so as to permit subsequent federal court jurisdiction, the courts are guided by the principle that charges of discrimination, which are filed by lay complainants, should not "result in the restriction of subsequent complaints based on procedural technicalities or the failure of the charges to contain the exact wording which might be required in a judicial pleading." *EEOC v. McCall Printing Corp.*, 633 F.2d 1232, 1235 (6th Cir.1980); *Tipler v. E.I. DuPont de Nemours & Co.*, 443 F.2d 125, 131 (6th Cir.1971). Therefore, the administrative complaint should be liberally construed to encompass all charges "reasonably expected to grow out of the charge of discrimination." *EEOC v. Bailey Co.*, 563 F.2d 439, 446 (6th Cir.1977) (quoted in *McCall Printing*, 633 F.2d at

1235), *cert. denied,* 435 U.S. 915, 98 S.Ct. 1468, 55 L.Ed.2d 506 (1978).

Although the Sixth Circuit has not specifically addressed the question of what facts must be pleaded in the administrative complaint to support federal court review of a plaintiff's allegation of a "continuing violation," the Ninth Circuit has confronted this issue. In *Sosa v. Hiraoka,* 920 F.2d 1451 (9th Cir.1990), the plaintiff's EEOC complaint alleged that his employer "subjected [him] to intimidation, harassment and disparate treatment with respect to the terms and conditions of employment." *Id.* at 1457. Furthermore, plaintiff alleged that his employer had "engaged in a pattern and practice of retaliating against [him]." *Id.* The court held that these allegations were sufficient to support subsequent federal court review of his claim of a continuing violation. Plaintiff's allegation of a "pattern or practice" was tantamount to an express claim of continuing violation. However, the court explained that even if the plaintiff had neglected to use this "pattern and practice" language, it would not be fatal because "even where ... claimants have failed to allege a continuing violation theory specifically in their EEOC charge, we have permitted suit on a continuing violation theory." *Id.* Thus, a continuing violation theory can be maintained in federal court, even though it is not specifically alleged, as long as that theory is "evidenced in the EEOC charge." *Id.* at 1458.

In the present case, the magistrate held that the continuing violation theory could not be reviewed in federal court since appellant did not raise the issue until his appeal to the EEOC from the Postal Service's decision. We believe that this conclusion is erroneous for two reasons.

■ First, the case law indicates that claims must be raised before the EEOC, or they will be barred. Since the magistrate agreed that appellant raised the continuing violation theory for the first time at the EEOC, appellant appears to have satisfied the requirements of administrative exhaustion. Because it is the scope of the EEO complaint, and those claims which are reasonably expected to grow therefrom, which

determine federal court jurisdiction, we conclude that appellant's continuing violation theory is within the federal court's jurisdiction. *McCall Printing,* 633 F.2d at 1235.

Secondly, even if appellant were required to first raise the continuing violation claim at the Postal Service hearing, and not just at the EEOC hearing, we believe that appellant met his burden under *McCall Printing* and *Sosa.*

In appellant's formal complaint to the Postal Service, he listed the following factual predicates to support his allegations of race and handicap discrimination:

1.  The August 4, 1988 job offer which he accepted on August 19, 1988 and appellee's subsequent failure to allow him to return to work on August 20, 1988.
2.  The employment of a white non-disabled male to replace appellant between August 3 and August 13, 1988.
3.  The September 7, 1988 "job offer" which "placed the Complainant at a disadvantage, thereby, making complainant junior to Mr. Huber with split days off."

Joint Appendix at 102–03. The magistrate held that these allegations were insufficient to support a charge of continuous discrimination.

However, in light of the liberal pleading standards governing administrative complaints, we consider these factual allegations sufficient to support a claim of a "continuing violation." Even though appellant did not allege a "pattern or practice" as did the complainant in *Sosa,* we believe that *Sosa* makes clear that a plaintiff need not plead such specifics. Instead "it is sufficient that the [agency] be apprised, in *general terms,* of the alleged discriminatory parties and the alleged discriminatory acts." *Sosa,* 920 F.2d at 1458 (emphasis added).

Indeed, appellant never even specifically alleged a *continuing violation* in his EEO complaint, although the magistrate held that it was raised there for the first time. Appellant merely alleged the facts which

comprised the continuing violation; it was the magistrate who first put this label on those facts. Therefore, if allegations of predicate facts were sufficient in the EEO complaint for the magistrate to find the existence of a continuing violation, this also suffices to make out a continuing violation claim in the formal complaint earlier filed with the Postal Service.

Appellee argues that the "mere" allegation of the "effects" of a prior discriminatory act is not sufficient to support a continuing violation theory. However, in light of the liberal standard by which we must evaluate appellant's administrative complaint, we believe that the allegations are adequate to support a continuing violation theory. Although appellant was precluded from accepting his first job offer on August 20, 1988, it cannot be said that the second job offer on September 9, 1988 was merely an "effect" of the first job offer. Rather, the appellant's employment status appeared to be an ongoing question from August 20 through September 9, 1988.

Because all of the acts appellant alleged in his district court complaint are, on their face, like or reasonably related to the allegations in his formal administrative complaint, the magistrate erred in holding that appellant did not exhaust his administrative remedies. To demand that plaintiffs allege more than appellant did to assure eventual federal court jurisdiction " 'would falsify the [Civil Rights] Act's hopes and ambitions' of providing a process that lay people can use effectively to resolve discrimination complaints." *Sosa*, 920 F.2d at 1458.

### III.

Appellee argues that even if appellant did exhaust his administrative remedies by raising the continuing violation theory below, he has nevertheless failed to demonstrate that appellee's discriminatory acts amounted to a "continuing violation." The magistrate did not address the merits of appellant's "continuing violation" theory, as it held that it could not be raised in federal court without raising it below. However, because we find that appellant did exhaust his administrative remedies, we must address the merits of appellant's claim of "continuing violation."

Appellant attempts to assert the "continuing violation" theory to avoid the thirty-day limitations period of 29 C.F.R. 1613.-214. That section gives a claimant thirty days to contact the EEOC after the date of the alleged discriminatory personnel action. Because the August 20, 1988 incident denying appellant the employment opportunity offered to him by letter of August 4, 1988 fell more than thirty days outside of September 29, 1988,—the date which appellant first contacted the EEOC—the magistrate held that appellant's claim was time-barred. However, appellant contends that because appellee's discriminatory acts amounted to an "ongoing pattern of discrimination" which culminated with the September 9, 1988 second job offer, and because that last act of discrimination occurred less than thirty days from his initial contact with the EEOC on September 29, 1988, his claim was timely brought. We agree.

The continuing violation theory, first articulated by the Supreme Court in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), held that discriminatory incidents which occur beyond the limitations period are actionable "where a plaintiff ... challenges not just one incident of [unlawful] conduct ... but an unlawful practice that continues into the limitations period, [in such cases] the complaint is timely when it is filed within [thirty] days of the last asserted occurrence of that practice." *Id.* (footnote omitted), *cited in Hull v. Cuyahoga Valley Bd. of Educ.*, 926 F.2d 505, 510–11 (6th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 2917, 115 L.Ed.2d 1080 (1991). Thus, where there is an ongoing, continuous series of discriminatory acts, they may be challenged in their entirety as long as one of those discriminatory acts falls within the limitations period. *Hull*, 926 F.2d at 511; *Held v. Gulf Oil Co.*, 684 F.2d 427, 430 (6th Cir.1982).

This circuit has held that we must "view 'continuous violations' as falling into two categories of 'narrowly limited exceptions' to the usual rule that 'statutes of limita-

tions ... are triggered at the time the alleged discriminatory act occurred.'" *Dixon v. Anderson,* 928 F.2d 212, 216 (6th Cir.1991), *quoting E.E.O.C. v. Penton Industrial Pub. Co.,* 851 F.2d 835, 837–38 (6th Cir.1988).

The first category of continuing violations arise "where there is some evidence of *present* discriminatory activity giving rise to a claim of a continuing violation; that is, where an employer continues presently to impose disparate work assignments or pay rates between similarly situated groups." *Dixon,* 928 F.2d at 216 (emphasis original). The court cited as an example an employer who gives unequal pay for equal work. "The rationale underlying this category is that the employer commits an illegal act, such as giving unequal pay for equal work, *each time* the employer dispenses the unequal pay." *Id.* (emphasis original). However, the court pointed out that "at least one of the forbidden discriminatory acts must have occurred within the relevant limitations period." *Id.*

The second category of continuing violations arise where there has occurred "a longstanding and demonstrable policy of discrimination." *Id.* at 217. "Unrelated incidents of discrimination will not suffice to invoke this exception; rather there must be a continuing 'over-arching policy of discrimination.'" *Id.* (citing *Janikowski v. Bendix Corp.,* 823 F.2d 945, 948 (6th Cir. 1987)).

■ Either of these theories may support appellant's continuing violation theory in the present case. First, we believe that appellant's allegations demonstrate that he alleged a specific discriminatory act within the limitations period as required under the first category of *Dixon.* The discriminatory second job offer of September 9, 1988 fell within thirty days of his September 29, 1988 first EEO contact. Appellant need not demonstrate that these acts occurred as part of a "plan" or "scheme." Rather, the alleged discriminatory acts must have occurred "throughout the term of ... employment" and be "related to his discharge." *Hull,* 926 F.2d at 511. We find that the alleged discriminatory practices were sufficiently interconnected to satisfy the definition of continuing violations as required by this circuit.

Appellee argues, however, that the September 9, 1988 job offer was merely an "effect" of the August 20, 1988 discrimination, and therefore cannot constitute a "separate incident." Indeed, the *Dixon* court recognized that the "limitations periods begin to run in response to the discriminatory *acts* themselves, not in response to the continuing *effects* of those acts." *Dixon,* 928 F.2d at 216 (emphasis original) (citing *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980)). However, we believe that the August 20, 1988 incident was not just an isolated discriminatory decision, such as occurs when an employee is abruptly terminated. Rather, the August 20, 1988 episode appears to be merely one in a progression of events which would ultimately lead to appellant's resignation. It was the second job offer on September 9, 1988 which, in actuality, precipitated the unlawful employment action. Up until that point in time, it appears that appellant had no reason to complain, as he continued to anticipate that he would eventually be rehired. *See Hull,* 926 F.2d at 511 (court must determine event that should have alerted average lay person to protect his rights). Therefore, we must categorize the second job offer as a "cause" of the discriminatory treatment, and not simply an after-effect.

In the alternative, we believe appellant would have more difficulty in demonstrating that he was subjected to a "policy of discrimination" thereby satisfying the second category of continuing violations announced in *Dixon.* There was evidence that appellant's supervisors attempted to force him to resign. Allegedly Mr. Fagan said to one of the clerks: "they were really trying to give [appellant] the shaft as far as the job goes. They just did not want any ... handicaps there." Joint Appendix at 436. In addition, it appears that the September 9, 1988 job offer was drafted in such a way to make it difficult for appel-

lant to accept. Joint Appendix at 426–29; Magistrate's Decision and Order, *id.* at 337.

Although it appeared to be a policy of the Postal Service's Xenia, Ohio management to get rid of appellant, we are uncertain that this type of policy qualifies as a "longstanding" one, so as to invoke the second category of "continuous violations." It may be that the Postal Service had a longstanding policy of denying employment to the disabled. However, appellant must demonstrate something more than the existence of discriminatory treatment in his case. *See Dixon,* 928 F.2d at 217 (discriminatory policy appeared plainly in the Ohio Revised Code and administrators openly adhered to this policy); *Conlin v. Blanchard,* 890 F.2d 811, 815 (6th Cir.1989) (policy of discrimination embodied in Michigan affirmative action plan).

Even though appellant may not have adequately demonstrated the existence of a "longstanding policy" of discrimination, we hold that he carried his burden of proving a continuous violation under the first category as defined in *Dixon.* Therefore, we find that appellant's complaint was timely filed pursuant to 29 C.F.R. 1613.214. As this court stated in *Hull:* "there are important policy reasons not to require that a discrimination suit be filed at the first instance of discrimination or not at all. To do so, would frustrate the broad remedial purposes of civil rights laws which encourage the eradication of discrimination." *Hull,* 926 F.2d at 511 (citing *Roberts v. North American Rockwell Corp.,* 650 F.2d 823, 827 (6th Cir.1981)).

### IV.

For the foregoing reasons, we RE-VERSE the magistrate's decision and RE-MAND for further proceedings consistent with this opinion.