NOT RECOMMENDED FOR PUBLICATION
File Name: 13a0193n.06

No. 11-3203

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Feb 21, 2013*
DEBORAH S. HUNT, Clerk

DUANE SPENCE,                                    )
                                                 )
    Plaintiff-Appellant,                         )
                                                 )
v.                                               )    ON APPEAL FROM THE UNITED
                                                 )    STATES DISTRICT COURT FOR THE
PATRICK R. DONAHOE, Postmaster General,          )    SOUTHERN DISTRICT OF OHIO
UNITED STATES OF AMERICA,                        )
                                                 )
    Defendants-Appellees.                        )

BEFORE:  SILER, DAUGHTREY, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.**  Duane Spence appeals the district court's grant of

summary judgment in Defendants' (collectively, USPS) favor dismissing his claims for disability

discrimination, hostile work environment, and retaliation under the Rehabilitation Act, and his state-

law claim for intentional-infliction-of-emotional-distress.  We **AFFIRM**.

**I.**

Spence, born in August 1944, began working for the United States Postal Service (USPS)

in 1981.  In 2004 and 2005, Spence worked as an equipment maintenance mechanic at the Bulk Mail

Center in Cincinnati, Ohio (BMC).  Spence asserts that while clearing a paper jam on a conveyor belt

on October 16, 2004, he felt a momentary sharp pain in his neck, left shoulder, and left arm.  Spence

continued to work, believing he had not suffered a reportable injury, but on October 28, he awoke

with severe pain that increased throughout the day.  On November 2, 2004, Spence saw his doctor,

Marc Alexander, who restricted Spence from work pending further tests. Spence called his supervisor, Sharon Maggioncalda, and told her about the pain, his doctor's visit, and his need to miss some work.

An MRI taken on November 4 revealed a herniated disc in Spence's neck. Spence believed he had suffered the injury clearing the jam in October. On November 9, Spence called Maggioncalda, informed her of the diagnosis, and reported that he was scheduled to see a neurologist, Dr. Ringer, on November 18. Prior to that appointment, Spence filled out a CA-1 workers' compensation form at the request of another supervisor, Gerald Adkins.

Dr. Ringer gave Spence a work note that listed four options: "no work," "sedentary work," "light work," and "medium work." Dr. Ringer checked "no work," restricting Spence until his next appointment on December 16. Spence saw Dr. Ringer again on December 16 and discussed his job duties with him. Dr. Ringer completed another work note restricting Spence from all work for at least two months. When Spence gave Adkins that note, Adkins reminded him that limited-duty work was available. Spence declined limited-duty work, told Adkins that he was still suffering from a lot of pain, and pointed out that Dr. Ringer's form indicated "no work."

After completing a series of physical-therapy sessions, Spence visited his brother in Las Vegas on January 10. After a few days Spence realized he had not progressed as much as he thought and cut his trip short by six days.

While Spence was off work, the Postal Inspection Service initiated an investigation of his claimed injury. Postal Inspector Gregory Duerstock testified that the discrepancy between the date of Spence's injury and the date it was first reported likely triggered the investigation. As part of the

investigation, inspectors visited Dr. Ringer's office to inquire whether Spence had told Dr. Ringer

that limited or light duty was available. According to Duerstock's Investigative Memorandum, Dr.

Ringer's office manager confirmed with Dr. Ringer that Spence had not presented the limited-duty

option to Dr. Ringer. Dr. Ringer eventually submitted a modified patient work note directly to USPS

stating that Spence could perform limited-duty work as of January 24, 2005. The Investigative

Memo also reported that, during his time off, Spence was observed going into a gym, gambling at

a casino, and going to a travel agency to book a trip to Las Vegas. The Memo also noted that

inspectors observed Spence carrying luggage, bending, and pushing a cart at the Indianapolis Airport.

Duerstock never spoke to Spence regarding the investigation. Spence testified that he did not receive

notice of Dr. Ringer's modified note permitting him to return to limited duty work as of January 24,

2005.

On February 15, 2005, Spence again saw Dr. Ringer, who allowed him to return to "light

work" with a 20-pound lifting restriction. When Spence reported for work on February 17, 2005,

Adkins, who knew about the Investigative Memo, called Spence to a pre-disciplinary hearing, asked

him questions about his time off, and told him that he was being accused of committing fraud by

filing a false workers' compensation claim. After the meeting, Adkins tried to send Spence home,

saying that there was no limited-duty work for him. When Spence expressed surprise that no work

was available, Adkins told Spence to sign a letter to the plant manager requesting light duty. Spence

did not know there was a difference between limited and light duty[1] and signed the letter, after which

---

[1]Limited duty is for employees whose injuries occurred on the job and are certified as work-related pursuant to workers' compensation claims. Light duty is modified duty for medical

he was assigned to work on carriage repair, which involves lifting carriages that weigh more than twenty pounds. Spence did not object to the assignment because he was afraid to make more complaints. Spence claims Adkins grinned and told Spence that "there's more evidence coming," and made a sarcastic remark about Spence carrying his own luggage.

Spence claims that he was harassed after he returned to work. He found the word "THIEF" written in his work area, and "Spence please leave" and "Spence is gone" on the work calendar. He noticed that a piece of cardboard that normally secluded the area where he was stationed had been removed, which he believed was so that he could be watched.

Spence testified that around February 19, during a morning meeting, Adkins told the union steward he was shorthanded and needed another employee because "the only one I have left is that piece of shit over there," referring to Spence. (Spence Dep., R. 12-1, at 19.) Spence also testified that on February 24, while speaking to technical supervisor Richard Eckes, Adkins gestured to Spence and asked whether Eckes needed any help from "someone useless." (Spence Aff., R. 21-1, at ¶ 28.) Adkins further said that he did not "have any problems calling a piece of shit a piece of shit." (*Id.*) When Eckes asked Adkins if he had Spence "counting carbon sheets," Adkins answered, "Yes, that's all he can do." (*Id.*) Spence testified that when he later asked Adkins and another supervisor for cushioned anti-fatigue matting, he was given a hard time and eventually walked away without any matting as Adkins and other employees made sarcastic comments and laughed. Later that day, Spence came to Adkins with a request for parts and Adkins told Spence that another

---

restrictions that are not work-related or compensable under workers' compensation. (Spence Aff., R. 21-1, at ¶ 24.)

supervisor was in charge that day and to take the parts off his desk before he hit Spence in the "f—ing head with them." (*Id.* at ¶ 30.)

On February 25, Adkins conducted a second pre-disciplinary interview, during which he asked Spence about his trip to Las Vegas and showed Spence a DVD of the Postal Inspector's video surveillance of him, which contained footage of Spence's engaging in various activities, including traveling to stores and restaurants and carrying luggage at the airport. Adkins made comments during the interview suggesting that USPS had more evidence against him. Over the next few days Spence began to believe he was being watched by USPS officials including Adkins. On February 28, Spence suffered a breakdown and went to see Dr. Alexander. Dr. Alexander recommended mental-health specialists who treated Spence and took him off work on March 2.

On March 4, Spence received a notice of proposed removal (termination) signed by Adkins and Earl Briggs, the Manager of Maintenance Operations. The basis of the notice was Spence's alleged dishonesty in failing to tell his doctor that limited duty was available, and his performance of tasks outside of work that were more strenuous than those he would have been assigned on limited-duty. On March 5, when Spence called Adkins regarding the proposed removal, Adkins asked Spence when he was going to retire and suggested that he would soon fire Spence or else risk losing his own job for disobeying orders. On April 8, Adkins fired Spence by giving him a notice of removal signed by Briggs. Spence grieved the dismissal and on April 15, Rhonda Burton, a

representative of management, settled the grievance for USPS. Spence's discipline was reduced to a one-week suspension without pay, and he was reinstated on April 16.[2]

On April 21, Spence was working on a grievance against Adkins in the union office, when a supervisor told Spence that Briggs wanted him out of the union office. Spence asserts that shortly after, he experienced chest pain and took leave from work to seek treatment from a cardiologist. On or about April 25, Spence filed a CA-2 form seeking compensation under the Federal Employees Compensation Act (FECA). On May 1, Spence's psychologist recommended that he take stress leave for at least one month, noting that Spence "was likely experiencing anxiety attacks clearly resulting from a very strained work environment." (R. 21-1, at 23–24.)

On May 9, while on leave, Spence visited USPS's Equal Employment Opportunity (EEO) office for informal counseling. He complained about age and disability discrimination and noted that he had been harassed, intimidated and humiliated since his return to work in February, and that USPS was trying to scare him into quitting or retiring.

On May 16, Briggs sent Spence a "Letter of Instruction" notifying him that limited-duty work was available and stating that it was his responsibility to notify his physician that limited duty is available. The letter also stated that USPS would follow the rules as set forth in an Employee and Labor Relations Manual "so as to minimize any adverse effect on you." (Letter of Instruction, R. 21-1, at 27.) Spence felt the letter contained an "implied threat of disciplinary action" and points out

---

[2]Rhonda Burton testified at deposition that she agreed to a one-week suspension because she believed the case "was not strong enough to" warrant removal, and she "could not see a removal holding up" in an arbitration. (Burton Dep., R. 21-4, at 13.)

that USPS issued a directive in 1982 prohibiting local managers from issuing letters of instruction regarding possible improprieties on the part of employees, describing the use of such letters as "highly suspect and . . . an attempt to avoid the discussion process . . . ." (Memo Regarding Letters of Information/Letters of Concern, R. 21-1, at 28.) Around the same time, Postal Inspectors went to Spence's house without advance notice to discuss his claims of stress, but Spence refused to speak to them without a lawyer present.

When Spence returned to work on June 16, 2005, he was called to a meeting with Richard Hohenstatt, a USPS manager who coordinated light- and limited-duty work. Hohenstatt told Spence that USPS knew Spence had gone to the EEO and that it considered him a problem. Hohenstatt urged Spence to keep a low profile, which Spence understood to mean that he should not engage in any more EEO activity or file additional grievances. Hohenstatt, however, maintains that he did not intend to threaten Spence or prevent him from seeking redress. Rather, Hohenstatt was representing Adkins in a dispute that had arisen between Adkins and Briggs over Spence's firing, and Hohenstatt was trying to protect Spence from additional discipline by Briggs so that Spence could serve as a favorable witness in the dispute.

On June 26, 2005, Spence slipped and injured his Achilles tendon at work. He told his union representative of the injury as soon as it happened, and the following day, within 24 hours of the injury, Spence reported the injury to supervisor Dan Howard, who had replaced Adkins. Howard sent Spence to the local urgent-care facility, where he was diagnosed with a sprain. He was put on temporary limited duty for seven days. On July 6, Spence was called to a pre-disciplinary hearing by Howard, who accused him of failing to immediately report his injury. Spence considered the

hearing to be more harassment, and believed that USPS would continue to search for ways to fire him. Spence retired effective July 31, 2005, citing intolerable conditions at work.

On July 19, 2005, before retiring, Spence filed a formal EEOC Complaint in which he checked boxes indicating he was alleging discrimination based on age, retaliation, and disability. He noted, among other things, that he was "harassed" and "intimidated." By letter dated August 15, 2005, USPS's office of EEO Compliance advised Spence that his complaint had "been accepted for investigation," and that the investigation would cover only the specific issues of age and physical disability discrimination, and retaliation arising from the March 2005 notice of proposed removal, and the April 2005 letter of removal that was later reduced to a suspension. (Acceptance Letter, R. 12-1, at 45–48.) The Acceptance Letter advised Spence that if he did "not agree with the defined accepted issue(s)," he must provide a written response specifying the nature of his disagreement within seven days, which Spence did not do. (*Id.* at 45; Postal Service Br. at 19.)

In a second EEOC complaint filed in January 2006, Spence alleged retaliation and stated that he felt compelled to retire in July 2005 following repeated and continuous harassment after engaging in EEO protected activity. (Second EEOC Compl., R. 38-1.) The second complaint was denied on timeliness grounds. The original EEOC Complaint was denied on all grounds in a decision that was subsequently adopted as the Final Agency Decision in April 2007.

Spence also filed a Federal Tort Claims Act (FTCA) administrative action in September 2006, alleging intentional and negligent infliction of emotional distress. The claim was denied. R. 12-3 at 14.

In July 2007, Spence filed a four-count complaint in federal district court against Patrick Donahoe, Postmaster General, and the United States Postal Service (collectively, USPS), claiming disability discrimination and retaliation in violation of the Rehabilitation Act of 1973, age discrimination in violation of the Age Discrimination in Employment Act (ADEA), and two state tort claims under the FTCA—intentional infliction of emotional distress, and negligent supervision.

Nearly one year later, USPS filed a motion for summary judgment on all claims. The district court granted the motion with respect to all Spence's claims except retaliation. After trial was delayed, USPS moved for and the district court granted summary judgment on the retaliation claim.

## II.  Rehabilitation Act Claims

Spence claims that USPS discriminated against him, created a hostile work environment, and retaliated against him on account of his disability, in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*.

We review de novo a district court's grant of summary judgment. *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). In evaluating a motion for summary judgment, we construe evidence in the light most favorable to the nonmoving party. *Macy v. Hopkins Cnty. School Bd. of Educ.*, 484 F.3d 357, 363 (6th Cir. 2007). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In assessing Rehabilitation Act discrimination claims based largely on circumstantial evidence, we apply the three-step *McDonnell Douglas* framework. *Gribcheck*, 245 F.3d at 550. Thus, a plaintiff must first set forth evidence from which a jury could conclude a prima facie case

of discrimination has been established. *Macy*, 484 F.3d at 364. The burden then shifts to the employer to articulate some "legitimate, nondiscriminatory reason" for its actions. *Id.* If the defendant meets that burden, "the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Id.*

A. Disability Discrimination

To establish a prima facie case of discrimination under the Rehabilitation Act, Spence must show that (1) he is disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) USPS knew or had reason to know of his disability; and (5) the position remained open while USPS sought other applicants or Spence was replaced. *DiCarlo v. Potter*, 358 F.3d 408, 418 (6th Cir. 2004) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)). The final element may also be satisfied by showing that "similarly situated non-protected employees were treated more favorably." *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007) (quoting *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995)).

By statute, employment discrimination complaints under the Rehabilitation Act are governed by the standards of the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12111, *et seq.*). *Lee v. City of Columbus*, 636 F.3d 245, 250 (6th Cir. 2011) (citing 29 U.S.C. § 794(d)). Cases construing one statute are therefore instructive in construing the other. *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir. 1997).

USPS argues that Spence has not established a prima facie case because he has not shown (1) that he is disabled, or (2) that similarly situated non-protected employees were treated more favorably. The district court agreed that Spence is not disabled within the meaning of the Act.

### 1. Spence's Disability

To qualify as "disabled" under the Rehabilitation Act, "an individual must (1) have a physical or mental impairment which 'substantially limits' him or her in at least one 'major life activity,' (2) have a record of such an impairment, or (3) be regarded as having such an impairment." *DiCarlo*, 358 F.3d at 418 (quoting *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002)) (alteration omitted); *see* 29 U.S.C. § 705(20)(B).[3] Spence argues that he qualifies as disabled under the first two prongs because his herniated disc substantially limited his major life activities of lifting, sitting, and sleeping. USPS does not dispute that Spence had a physical impairment, or that lifting, sitting, and sleeping constitute major life activities, but argues that Spence's limitations were neither substantial nor permanent.

### a. Substantially Limited

During the period relevant to this case, the EEOC's regulations defined "substantially limited" as: "Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life

---

[3]Currently, the Rehabilitation Act cites to the definition of disability contained in the ADA, whereas the version in effect during the events giving rise to this lawsuit contained an identical definition within the text of the Rehabilitation Act itself. *See* 29 U.S.C. § 705(20)(B) (2008).

activity." 29 C.F.R. § 1630.2(j) (2005), *superseded by* 20 C.F.R. § 1630.2(j) (2011) (construing "substantially limits" broadly in favor of expansive coverage in accordance with the ADA Amendments Act of 2008). In determining whether an individual is substantially limited in a major life activity, the following factors are considered: "(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) . . . permanent or long term impact of or resulting from the impairment." 29 C.F.R. 1630.2(j)(2) (2005). The existence of a disability is determined in a case-by-case manner. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (effective Jan. 1, 2009).

The district court determined that Spence failed to make a prima facie showing of disability because he could not show that his impairment was of sufficient duration to be substantially limiting or that his herniated disc severely restricted any major life activity.

In *Toyota Motor Mfg.*, 534 U.S. at 198, the Supreme Court held that temporary physical conditions do not generally constitute substantial impairments. *Id.* ("The impairment's impact must also be permanent or long-term."); *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 938 (6th Cir. 2000) (where evidence did not clearly indicate plaintiff's injury was permanent, mere possibility of recurrence was insufficient to establish substantial impairment). The ADA Amendments Act of 2008 expressly overruled this holding, stating that the Supreme Court incorrectly "interpreted the term 'substantially limits' to require a greater degree of limitation than was intended by Congress." *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (effective Jan. 1, 2009). However, this Court has held that those amendments do not apply to pre-amendment conduct. *See*

*Milholland v. Sumner Cnty. Bd. of Educ.*, 569 F.3d 562, 565–67 (6th Cir. 2009). Accordingly, because Spence's termination occurred prior to the amendments, the prior version of the ADA applies. *See Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012).

Spence argues that the district court's conclusion that he failed to show that his impairment was of sufficient duration to be substantially limiting was based on the erroneous belief that Spence's impairment lasted only four months—from the time he left work in late October 2004, until he returned in mid-February 2005—when, in fact, Spence was not released by his doctor to unrestricted duty until late May 2005, for a total impairment period of seven months. Spence also argues that no strict durational requirement governs whether an impairment is substantially limiting. However, under the applicable version of the ADA, although neither the statute nor the regulations state that an impairment must last for a specific length of time before it can be considered substantially limiting, lack of a permanent or long-term impairment is generally fatal to a claim of disability. *Roush v. Weastec, Inc.*, 96 F.3d 840, 844 (6th Cir. 1996) ("Because plaintiff's kidney condition was temporary, it is not substantially limiting and, therefore, not a disability under the ADA."); *see also Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998) (holding that a seven-month impairment with unspecific residual limitations was not substantially limiting of a police officer's ability to work).

Even if Spence's impairment lasted for seven months rather than four, Spence has not provided evidence to show that his impairment was permanent or long-term. Spence's doctor asked him not to work until three months after his injury, and then cleared him for light work with a twenty-pound lifting restriction. He was released to full duty in late May 2005. Spence does not

assert that his doctor ever suggested that the impairment would be permanent, but instead argues that, at the time USPS made adverse decisions with respect to his employment, "[n]o one knew . . . how long it would be until, or even if, [Spence] could resume his full range of duties." (Spence Br. at 40.) Spence contends that USPS's decision should be evaluated based on the facts that existed at that time, when Spence "was still on restricted duty and was still subject to a lifting restriction." (Spence Br. at 40.) In support, Spence cites cases involving other types of discriminatory treatment that evaluate allegations of discrimination based on the facts available at the time the employment decisions were made. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 240–41 (1989) ("The critical inquiry . . . is whether gender was a factor in the employment decision at the moment it was made"). However, Spence cites no authority for the proposition that a plaintiff is not required to establish that he has a permanent or long-term disability under the Rehabilitation Act where the full extent of a physical impairment is not yet clear at the time an adverse employment decision is made. On the contrary, the applicable case law suggests that prior to the 2008 amendments to the ADA, the term "substantially limited" was "interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota Motor Mfg.*, 534 U.S. at 197. And even assuming Spence is correct to assert that the relevant facts are those possessed by the USPS at the time the adverse employment decisions were made, Spence has failed to show that evidence available at the time of the adverse decisions indicated that his impairment would be permanent or long-term. We therefore conclude that Spence's impairment was not sufficiently long-term to be substantially limiting.

b. <u>Record of Impairment</u>

Spence also claims that he is disabled under the "record of impairment" prong of the definition of disability. *See Mahon*, 295 F.3d at 589. A plaintiff has a "record of impairment" if he or she "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002); 28 C.F.R. § 35.104 (2005); 29 C.F.R. § 1630.2(k) (2005). Courts that have analyzed this prong have held that it includes "people who have recovered from previously disabling conditions . . . but who may remain vulnerable to the fears and stereotypes of their employers." *See Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 509 (7th Cir. 1998) (holding plaintiff had established a genuine dispute of fact regarding whether she was disabled where she had a record of a learning disability in the past). The "plaintiff only needs to show that 'at some point in the past' he had [a substantially limiting impairment]." *Knight v. Metro. Gov't of Nashville & Davidson Cnty., Tn.*, 136 F. App'x 755, 760 (6th Cir. 2005) (unpublished) (holding that a police officer who was not presently impaired, but who was previously injured in a motorcycle accident on the job and received disability pensions for twenty years, during which he worked intermittently as his injuries allowed, had raised a factual dispute as to whether he had a record of disability) (citing *Lloyd v. E. Cleveland City Sch. Dist.*, 232 F. Supp. 2d 806, 812 (N.D. Ohio 2002)).

Spence argues that his herniated disc, which led him to miss multiple months of work before returning with lifting restrictions, constituted a record of impairment. The district court rejected this claim for the same reasons it rejected his present disability claim: Spence's impairment was not of a sufficient duration or severity to be considered substantial. We agree. Although the "record of impairment" prong encompasses plaintiffs who have recovered from their injuries, and therefore

contemplates injuries that are not permanent, it nevertheless requires that a plaintiff at one point had (or was classified as having) an impairment that substantially limited a major life activity. 29 C.F.R. § 1630.2(k) (2005). Accordingly, Spence cannot establish a disability under this prong.

Spence did not argue below that he was disabled under the "regarded as" prong of the definition of disability. He now relies on Adkins's comments to establish that USPS in fact regard him as having a disability. But taken in context, Adkins's comments and conduct were directed at ridiculing Spence because Spence claimed to be more disabled than Adkins believed he was.

B. Hostile Work Environment

1. Waiver

USPS argues that Spence waived his hostile-work-environment claim[4] by failing to exhaust administrative remedies because the EEOC Acceptance Letter never referenced such a claim. However, Spence's EEOC complaint refers to "harassment" and "intimidation," and EEOC complaints are not meant to be overly rigid, but "should be liberally construed to encompass all claims 'reasonably expected to grow out of the charge of discrimination.'" *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006) (quoting *Haithcock v. Frank*, 958 F.2d 671, 675 (6th Cir. 1992)). Additionally, the EEOC addressed the hostile-work-environment claim in its decision. Therefore, Spence has not waived his hostile-work-environment claim.

2. Analysis

---

[4]The district court construed Spence's claim of harassment as a hostile work environment claim, and Spence uses the terms interchangeably in his brief.

To make out a hostile-work-environment claim under the Rehabilitation Act, a plaintiff must show "(1) he was disabled; (2) he was subject to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment unreasonably interfered with his work performance; and (5) defendant either knew or should have known about the harassment and failed to take corrective measures." *Plautz v. Potter*, 156 F. App'x 812, 818 (6th Cir. 2005) (unpublished) (borrowing the hostile work environment claim under the Rehabilitation Act from the ADA context) (citing *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996)).

Here, Adkins clearly harassed Spence; but Spence's claim is based on a violation of the Rehabilitation Act and therefore Spence must establish a disability within the meaning of the Act. Because we conclude in accordance with the analysis above that Spence cannot establish a disability within the meaning of the Act, we affirm the district court's conclusion that Spence cannot establish a hostile work environment claim under the Rehabilitation Act.

C. Retaliation

Spence claims that after his visit to the EEO Office for informal counseling, USPS took three retaliatory actions: (1) Briggs sent him a "Letter of Instruction"—even though such letters were against USPS rules—notifying him that limited-duty work was available and stating that it was his responsibility to notify his physician of this fact; (2) Light Duty manager Hohenstatt told Spence that he knew Spence had gone to the EEO, that USPS considered him a problem employee, and that he should keep a low profile; (3) Spence was accused of failing to report another work-related injury

-17-

and had to undergo a pre-disciplinary hearing,[5] even though he reported the injury within 24 hours of its occurrence in accordance with USPS policy; and (4) through these actions, USPS constructively discharged Spence.

### 1. Waiver

USPS argues that Spence waived his retaliation claim by failing to include in his first EEOC complaint the three acts of retaliation alleged. Although claims that an employer retaliated in response to an earlier charge need not be exhausted, *Ang v. Proctor & Camble Co.*, 932 F.2d 540, 546–47 (6th Cir. 1991), retaliatory conduct that occurs prior to the filing of the EEOC complaint is distinguishable from such claims, and must be exhausted. *Id.* at 547. Here, Spence did check the box marked "retaliation" in his first EEOC complaint and, after describing various actions taken by USPS, noted, "I think they want me to go!" (EEOC Compl., R. 21-1, at 30.) This was sufficient notice to USPS that retaliation was at issue, and that constructive discharge may be at issue. Accordingly, Spence did not waive his retaliation claim.

### 2. Prima Facie Case

A prima facie case of retaliation requires a showing that "1) the plaintiff engaged in legally protected activity; 2) the defendant knew about the plaintiff's exercise of this right; 3) the defendant then took an employment action adverse to the plaintiff; and 4) the protected activity and the adverse employment action are causally connected." *Gribcheck*, 245 F.3d at 550. "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Nguyen*

---

[5]The district court stated that the pre-disciplinary hearing was scheduled but never occurred, but Spence testified that it did, in fact, occur. (Spence Aff., R. 21-1, at ¶ 48.)

*v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Spence based his claim on his activity in pursuing an EEOC claim.

USPS argues, and the district court concluded, that Spence cannot establish that USPS took an adverse employment action.

The district court initially found that only Hohenstatt's conversation with Spence constituted an adverse employment action rising to the level of actionable retaliation. But the court later reconsidered that decision and granted summary judgment, finding that Hohenstatt's conversation also "lies more clearly on the no-harm end of the spectrum" of cases. (Opinion and Order, R. 44, at 9.)

Actionable retaliation is retaliation that produces an injury or harm. *Burlington N. & Santa Fe Ry. Co. v White*, 548 U.S. 53, 67 (2006) (reassignment of work duties and 37-day suspension without pay constituted actionable retaliation). "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citation and internal quotation marks omitted). A materially adverse action does not include trivial harms, such as "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*; *see also Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 996–97 (6th Cir. 2009) (plaintiff's transfer to another department did not rise to the level of materially adverse where he did not allege that it "resulted in significantly different responsibilities, a change in benefits, or any other negative effect"). This standard is phrased in general terms "because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters."

*Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69. Thus, even where certain incidents alone may not rise to the level of being materially adverse employment actions, this Court has found that multiple "incidents taken together might dissuade a reasonable worker from making or supporting a discrimination charge." *Sanford v. Main St. Baptist Church Manor, Inc.*, 327 F. App'x 587, 599 (6th Cir. 2009) (unpublished) (finding that various actions by employer, including supervisor's negative evaluations and recommendation that plaintiff be terminated, might dissuade a reasonable worker from making a discrimination charge).

Here, Spence presented evidence that the "Letter of Instruction" that Briggs sent him was against USPS regulations, and Spence testified that he viewed the letter as an implied threat that he would be terminated if he failed to inform the physician treating him for work-related anxiety that limited duty work was available. However, the letter did not affect Spence's rights or work duties, did not threaten retaliation for pursuing a discrimination charge, and noted that USPS would follow labor guidelines "so as to minimize any adverse effect on" Spence. Such a letter would not dissuade a reasonable person from making or supporting a charge of disability discrimination. Nor does holding a pre-disciplinary meeting, without evidence that it led to any additional consequences, constitute an adverse material employment action.

We also do not believe that Hohenstatt's conversation with Spence constitutes an adverse action by USPS. Hohenstatt was not Spence's supervisor and Spence's transcript of the conversation indicates that Hohenstatt made clear he was not speaking to Spence as management but as "one employee to another," and that he was even involved in a dispute against management over its treatment of Spence. We do not believe in these circumstances that Hohenstatt's suggestion that

Spence keep a "low profile" constitutes a materially adverse employment action. *See Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999) (concluding that a threat of discharge did not constitute an adverse employment action where there was no evidence that the threatening supervisor had the authority to transfer or terminate the employee and the threat merely stated the possibility of discharge); *Plautz v. Potter*, 156 F. App'x 812, 817–18 (6th Cir. 2005) (threat related by coworker that supervisor would go through employee's records to search for a way to justify terminating him was not an adverse employee action).

Finally, Spence argues that he has shown an adverse employment action by establishing a constructive discharge. *See Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001) (citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)). To establish constructive discharge, a plaintiff must show "1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." *Logan*, 259 F.3d at 568–69 (alteration omitted). Both the "employer's intent and the employee's objective feelings must be examined." *Id.* at 569 (citing *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)). "A constructive discharge claim exists if the plaintiff shows that a reasonable employer would have foreseen that a reasonable employee would feel constructively discharged." *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 382 (6th Cir. 1993).

In support of his retaliation claim based on constructive discharge, Spence recounts all of the facts giving rise to the complaint. But for the purposes of constituting an adverse employment action for a retaliation claim, only those acts that occurred after Spence engaged in a protected activity—the

same actions analyzed above—are relevant. We agree with the district court that Spence has not established a genuine dispute as to whether Hohenstatt's conversation was intended to force Spence to quit. Nor can Spence establish that a reasonable employer would have foreseen that Spence would feel constructively discharged because of a Letter of Instruction or a predisciplinary meeting. Accordingly, Spence has not made out a prima facie case of retaliation.

### III. Intentional Infliction of Emotional Distress

Under the FTCA, the United States may be liable for personal injury caused by the negligent acts or omissions of a federal employee acting in the scope of employment under circumstances where the United States, if a private person, would be liable to the plaintiff according to the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). Spence argues that the district court erred in granting summary judgment on his state-law intentional infliction of emotional distress claim on the basis that the United States' conduct did not rise to the level of outrageousness required under Ohio law.

Under Ohio law, a claim of intentional infliction of emotional distress requires requires (1) extreme and outrageous conduct; (2) of intentional or reckless character; and (3) that causes severe emotional distress. *Yaeger v. Local Union 20*, 453 N.E.2d 666, 671 (Ohio 1983) (abrogated on other grounds by *Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007)). To constitute extreme and outrageous conduct, it is not enough that the defendant "has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Reamsnyder v. Jaskolski*, 462 N.E.2d 392, 394 (Ohio 1984).

The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

The district court correctly found that USPS's conduct does not meet this high bar. Even the worst conduct complained of by Spence was not so outrageous as to go beyond "insults, indignities, threats, annoyances, petty oppressions, or other trivialities," to which liability does not extend. *Baab v. AMR Servs. Corp.*, 811 F.Supp. 1246, 1269 (N.D. Ohio 1993) (citing *Reamsnyder*, 462 N.E.2d at 394)). Accordingly, we affirm the district court's grant of summary judgment on Spence's intentional-infliction-of-emotional-distress claim.

**IV.**

For the foregoing reasons, we **AFFIRM** the judgment of the district court.